AO 93  (Rev. 11/13) Search and Seizure Warrant                                    AUSA: Ashley N. Martin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    26-mj-194 |
| | ) | |
| A NAVY BLUE COLORED APPLE IPHONE AND AN | ) | |
| APPLE IPHONE IN A BLACK CASE | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the      Eastern      District of      Pennsylvania
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before      February 18, 2026      *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      the Duty Magistrate Judge      .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*      ☐ until, the facts justifying, the later specific date of _____      .

Date and time issued:      _____

*Judge's signature*

City and state:      Philadelphia, PA                    HON. CAROL SANDRA MOORE WELLS
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  26-mj-194 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_Executing officer's signature_

_Printed name and title_

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE (1) WITH UNKNOWN TELEPHONE NUMBER AND UNKNOWN IMSI A NAVY BLUE COLORED APPLE IPHONE AND (2) UNKNOWN TELEPHONE NUMBER AND UNKNOWN IMSI AN APPLE IPHONE IN A BLACK CASE | Case No. 26-mj-194 <br><br> **Filed Under Seal** |

**AFFIDAVIT OF PROBABLE CAUSE
IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT**

I, Ryan Scanlan, being duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.     I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). That is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.     I am employed as a Special Agent with the Drug Enforcement Administration ("DEA") in Philadelphia, Pennsylvania. I am currently assigned to the Philadelphia Division Office Enforcement Group 42, which investigates narcotics trafficking. I have been employed as a DEA Special Agent since January 2022. While employed by the DEA, I have received specialized training from the DEA Academy at Quantico, Virginia, in the investigation and identification of narcotics traffickers, and have participated in investigations, which have led to the arrests of narcotics traffickers. I have conducted physical and electronic surveillance, debriefed confidential sources, interviewed witnesses, worked with federal, state, and local narcotic agents and officers, executed search warrants, analyzed telephone toll records, and

written affidavits used in support of applications for federal Title III interceptions, and I have led the investigations that utilized those Title III interceptions.

3.      Prior to joining the DEA, I worked for the United States Capitol Police ("USCP") in Washington, DC as a uniformed police officer. During my time in this role, I provided security services to protect Congress, employees, and visitors, and property under the jurisdiction of Congress from all threats of civil disorder or criminal activity. I patrolled the USCP jurisdiction in marked police vehicles responding to calls, violations, and duress alarms relating to crimes in progress or discovered, enforced traffic regulations, assisted at accident scenes, and maintained a law enforcement presence, participated in preliminary investigations, participated in rapid response operations for civil disturbances or emergency situations, prepared reports, and testified in court.

4.      From training and experience during my time with the DEA, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies and drug trafficking organizations. I am familiar with the clandestine manner in which cocaine, crack, heroin, marijuana, methamphetamine, and other controlled substances are manufactured, sold, distributed, and used. I am also familiar with prices, slang terminology, codes, and mechanisms used in association with the distribution and use of illicit narcotics.

5.      From my experience and training, I have learned, that: (a) drug traffickers rarely, if ever, refer to illegal drugs by name; instead, to conceal the true nature of their illegal activities and to prevent detection by law enforcement, they refer to the drugs and drug quantities using seemingly generic terms; (b) narcotics traffickers frequently use cellular telephones, and other communication devices to further their illegal activities, by remaining in constant or ready

communication with one another without restricting either party to a particular telephone or location at which, they might be the subject of physical surveillance by law enforcement authorities; and (c) narcotics traffickers frequently transmit pre-arranged numerical codes to text messaging services on cellular phones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the cell phone. I am aware that those involved in illegal drug operations often subscribe their telephones and cellular telephones in the names of others or purchase pre-paid cellular telephones that require the purchaser to provide little or no identifying information to utilize the phone. This is done in an effort to avoid detection of law enforcement. Additionally, I am aware that drug traffickers often use multiple cellular telephones to conduct illegal narcotics activity. Even more, individuals involved in the illicit distribution of controlled substances attempt to thwart electronic surveillance and conceal their criminal activities using multiple cellular telephones and by changing their cellular telephone numbers frequently.

**PURPOSE OF AFFIDAVIT**

6.      This affidavit is made in support of an application for a search warrant for the following devices: one navy blue colored Apple iPhone with unknown telephone number and unknown international mobile subscriber identity ("IMSI") number (hereinafter referred to as "SUBJECT DEVICE-1") and one Apple iPhone in a black case with unknown telephone number and unknown IMSI (hereinafter referred to as the "SUBJECT DEVICE-2"). This application seeks authority to search SUBJECT DEVICE-1 and SUBJECT DEVICE-2 and seize evidence of crimes against the United States, specifically violations of Title 21, United States Code, Section 841(a)(1) and 846 as described in Attachment B.

7.      As set forth below, there is probable cause to believe that SUBJECT DEVICE-1 and SUBJECT DEVICE-2 have been used in the commission of crimes, including violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances, and conspiracy to commit controlled substance offenses). Because this affidavit is submitted for the limited purpose stated above, it does not include every fact known to me about the investigation, only those establishing probable cause to search the contents of SUBJECT DEVICE-1 and SUBJECT DEVICE-2.

**FACTS ESTABLISHING PROBABLE CAUSE**

8.      In September 2025, the DEA Philadelphia Field Division ("DEA Philadelphia") Group 42 began an investigation into Griselle LACOSTA-FRANCO after receiving information from the Philadelphia Police regarding LACOSTA-FRANCO.

9.      On September 22, 2025, at approximately 10:33 a.m., a license plate reader on Philadelphia Police Cruiser #1533 was driving in front of 3444 Shelmire Avenue, Philadelphia, PA. The license plate reader alerted to law enforcement that the 2021 silver Dodge Ram truck with Pennsylvania license plate #ZXH-3735 (VIN# 1C6SRFFT1MN597193) was a stolen motor vehicle. The Dodge Ram was parallel parked on the side of the road in front of 3444 Shelmire Avenue, Philadelphia, PA.

10.     Philadelphia Police Department plain clothes officers, Officer Sean Kennelly and Officer Stephen Burgoon, responded to the area of 3444 Shelmire Avenue, Philadelphia, PA.

11.      Officer Kennelly and Officer Burgoon observed the Dodge Ram unoccupied, parked on the side of the road, parallel parked in front of 3444 Shelmire Avenue, Philadelphia, PA.

12.     A short time later, Officer Kennelly and Officer Burgoon observed a female, later identified as Griselle LACOSTA-FRANCO, placing an object in the rear passenger's seat of the truck. Officer Kennelly and Officer Burgoon observed LACOSTA-FRANCO get into the front driver's seat of the Dodge Ram and turn the Dodge Ram on. Officer Kennelly and Officer Burgoon called two uniform patrol officers in the area to respond.

13.     At approximately 11:30 a.m., Officer Clemens and Officer Morris arrived in the area and approached the Dodge Ram. Officer Clemens and Officer Morris observed LACOSTA-FRANCO sitting in the front driver's seat of the Dodge Ram. She was the only person in or around the vehicle. Officer Clemens and Officer Morris observed LACOSTA-FRANCO exit the Dodge Ram and stand outside of the driver's side door. LACOSTA-FRANCO was wearing blue latex gloves on her hands. Officers attempted to detain LACOSTA-FRANCO, and she resisted those efforts.

14.     LACOSTA-FRANCO repeatedly slipped her handcuffs—meaning she repeatedly moved them down her wrists and off of her hands—and attempted to conceal items in her pockets, including SUBJECT DEVICE-1 and SUBJECT DEVICE-2.  At this time, LACOSTA-FRANCO was placed under arrest by Officer Clemens and Officer Morris.

15.     Officer Horton conducted a search of LACOSTA-FRANCO and recovered approximately fifty blue glassine baggies containing fentanyl, a vial containing heroin, approximately ten suboxone strips, multiple prescription pills, a container of "crack" cocaine, SUBJECT DEVICE-1, and SUBJECT DEVICE-2.

16.     Officer Kennelly notified the proper chain of command. Detective Gregory Kravitz reached out to Phoenixville Police Department. Phoenixville Police Department declined to respond to the scene due to LACOSTA-FRANCO being arrested with the Dodge Ram (the

police department had originally asked all law enforcement to hold the vehicle for latent prints if found) but requested that Philadelphia Police Department conduct an inventory search to inventory the contents of the vehicle, consistent with PPD policy. Officers Kennelly and Burgoon conducted an inventory search of the Dodge Ram and located a gray plastic bag on the front driver's seat of the Dodge Ram. The gray plastic bag contained a clear, heat-sealed bag with a white substance inside and another clear heat-sealed bag with a brown substance inside. The DEA Northeast Laboratory determined that the white substance was heroin and weighed approximately 906.1 grams (+/-0.2 grams).  The DEA Northeast Laboratory determined that the brown substance was heroin and weighed approximately 595.3 grams (+/-0.2 grams).

17.    Officer Kennelly located a navy-blue backpack in the rear passenger's seat of the Dodge Ram. The backpack contained multiple black plastic bags. Inside of the black plastic bags were blue latex gloves which were consistent with the blue latex gloves LACOSTA-FRANCO was wearing at the time of her arrest, a plastic bag with a brown powdery substance inside of it, later determined to be AnaSed, and a Pennsylvania driver's license #30451867 with name Miguel ROMAN Jr. date of birth 11/14/1989. Officers located another black bag inside of the plastic bags with a white powdery substance inside of it. The DEA Northeast Laboratory determined that the white substance was cocaine and weighed approximately 17.2 grams (+/- 0.2 grams). The other substances seized from the trunk of the Dodge Ram were tested by the DEA Northeast Laboratory and the substances identified were as follows O6-Monocetylmorphine approximately 49.9 grams (+/- 0.2 grams), fentanyl approximately 52.5 grams (+/- 0.2 grams), and approximately 10.189 grams (+/-0.002 grams) fentanyl. Officers additionally recovered a pill bottle with the name Rosa RIVERA listed as the patient.

18.     Inside of the black plastic bag, officers also recovered new and unused drug packaging materials, "SOS" stamped baggies, glassine baggies, and rubber bands. There were also cardboard boxes with blue glassine baggies, consistent with the glassine baggies found on LACOSTA-FRANCO at the time of her arrest, and three digital scales in the bag.

19.     Philadelphia police officers spoke with the original owner of the Dodge Ram. The owner stated that on September 15, 2025, two individuals—R.B.D.S. and S.F.—took his Dodge Ram without his permission. He denied ownership of the narcotics that officers found in the Dodge Ram and told police that LaCOSTA-FRANCO did not have permission to use his vehicle.

20.     Investigators do not know the telephone numbers assigned to SUBJECT DEVICE-1 or SUBJECT DEVICE-2.  However, based on my training and experience, I know that it is common for drug traffickers to utilize different cellular telephones or devices to conduct their drug trafficking activities in order to avoid law enforcement detection.

### REQUEST TO SEARCH CELLULAR TELEPHONES

21.     Based on my training and experience, I know drug traffickers commonly utilize their cellular telephones to communicate with co-conspirators to facilitate, plan, and execute their drug transactions and may discuss the use of firearms to protect their product and proceeds or to otherwise further their criminal activities. For example, drug traffickers often store contacts lists, address books, calendars, photographs, videos, audio files, text messages, call logs, and voice mails in their electronic devices, such as cellular telephones, to be used in furtherance of their drug trafficking activities.

22.     I also know that those involved in drug trafficking communicate with associates using cellular telephones to make telephone calls. If they are unable to reach the party called, they frequently leave voice mail messages. I am aware that Apple-based and Android-based

phones download voice mail messages and store them on the phone itself so that there is no need for the user to call in to a number at a remote location and listen to the message. In addition, I know those involved in drug trafficking communicate with associates using cellular telephones and tablets to send e-mails and text messages and communicate via social media networking sites. By analyzing call and text communications, I may be able to determine the identity of co-conspirators and associated telephone numbers, as well as if there were communications between associates during the commission of the crimes.

23. Furthermore, cellular telephones also contain address books with names, addresses, photographs, and phone numbers of a person's regular contacts. Based on my training and experience, drug traffickers frequently list drug associates in directories, often by nickname, to avoid detection by others. Such directories as the ones likely contained in the seized cellular telephones, are one of the few ways to verify the numbers (*i.e.*, telephones, pagers, etc.) being used by specific traffickers.

24. In addition, those involved with drug trafficking often take photographs or make videos of themselves and their co-conspirators and retain them on their electronic devices such as cellular telephones. This evidence would show associations between accomplices, *i.e.* photographs of accomplices and/or individuals common to co-conspirators. I am also aware that drug traffickers often take photographs or make videos of drugs and drug proceeds with their cellular telephones and tablets. Based on my training and experience, those who commit these crimes often store these items on their phones in order to show to associates, and/or to upload to social media.

25. Furthermore, based on training and experience, I know drug traffickers often use a cellular phone's Internet browser for web browsing activity related to their drug trafficking

activities. Specifically, drug traffickers may use an Internet search engine to explore where banks or mail delivery services are located or may use the Internet to make reservations for drug-related travel. In addition, I know that drug traffickers also use their cellular telephones' Internet browser to update their social networking sites in order to communicate with co-conspirators, display drugs and drug proceeds, or to post photographs of locations where they have traveled in furtherance of their drug trafficking activities.

26.    In addition, drug traffickers sometimes use cellular telephones as navigation devices, obtaining maps and directions to various locations in furtherance of their drug trafficking activities. These electronic devices may also contain GPS navigation capabilities and stored information that could identify where these devices were located.

27.    Furthermore, based on my training and experience, forensic evidence recovered from the review of a cellular telephone can also assist in establishing the identity of the user of the device, how the device was used, the purpose of its use, and when it was used. I am aware that cellular telephones are all identifiable by unique numbers on each phone, including serial numbers, international mobile equipment identification numbers (IMEI) and/or electronic serial numbers (ESN). The search of each phone helps determine the telephone number assigned to each device, thus facilitating the identification of the phone as being used by members of the conspiracy. I am aware forensic tools may uncover information/data users have deleted which may still be able to be recovered from the device.

### ELECTRONIC DEVICES

28.    As described above and in Attachments A-1, A-2, and B, this application seeks permission to search and seize things that the above item might contain, in whatever form they are stored. As used herein, the term "electronic device" includes any electronic system or device

capable of storing or processing data in digital form, in this case referring specifically to wireless or cellular telephones.

29.     Based on training and experience, as well as information related to me by others involved in the forensic examination of electronic/digital devices, I know data in digital form can be stored on a variety of digital devices. I know electronic devices, including cellular telephones used by drug traffickers and digital/computing devices, are likely to be repositories of evidence of crimes. I know an electronic device such as a cellular telephone may contain data that is evidence of how the electronic device was used, data that was sent and received, and other records that may indicate the nature of the offense.

30.     Furthermore, electronic devices, such as cellular telephones and computers, can store information for long periods of time. Examples of such information include text and multimedia message conversations, call history, voice mail messages, e-mails, photographs, and other data stored on the device. Similarly, I know, from training and experience, when cellular telephones or electronic devices are used to access the internet, a browser history is also frequently stored for some period of time on the electronic device. This information can sometimes be recovered with forensic tools.

31.     Based on my experience and training, as well as the experience and training of other agents, I know that even when a user deletes information from a device, it can sometimes be recovered with forensic tools.

32.     Based on training and experience, as well as information related by agents and others involved in the forensic examination of electronic devices, I know that searching electronic devices can be a highly technical process that requires specific expertise and specialized equipment. There are many types of electronic devices and software programs in use

today which require specialized equipment to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of electronic devices, operating systems, or software applications being searched.

33.    Furthermore, I am aware that electronic data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching electronic devices can require the use of precise, scientific procedures that are designed to maintain the integrity of electronic data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on electronic devices.

34.    I know from my training and experience that the volume of data stored on many electronic devices will typically be so large it will require a search of the device in a law enforcement laboratory or similar facility. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500-gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

35.    I am aware that electronic files or remnants of such files can be recovered months or years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on an electronic device, the data contained

in the file does not actually disappear; rather, that data remains until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

36.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), electronic devices can contain other forms of electronic evidence as well. In particular, records of how an electronic device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the electronic devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregated from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word

processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the electronic device was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment and also can require substantial time.

37.    Further, evidence of how an electronic device has been used, what it has been used for, and who has used it, may be the absence of particular data on an electronic device. For example, to rebut a claim that the owner of an electronic device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the electronic device remotely is not present on the electronic device. Evidence of the absence of particular data on an electronic device is not segregated from the electronic device. Analysis of the electronic device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time.

38.    Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be co-mingled with criminal evidence. In other

cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

39.     I believe and assert that a search of the electronic files and memory of SUBJECT DEVICE-1 and SUBJECT DEVICE-2 will yield evidence of violations of the federal laws, including, but not limited to, disclosing the identities of persons involved in the commission of these offenses, as well as the existence and scope of the conspiracy. Evidence of calls made by, to, and among the members of this conspiracy, in the course of the events related in this affidavit, are also expected to be disclosed by the requested search.

40.     Therefore, based on the information, facts and circumstances stated above, there is probable cause to believe that SUBJECT DEVICE-1 and SUBJECT DEVICE-2, seized by law enforcement, were used in the commission of drug trafficking offenses and contain evidence of those offenses specifically involving LACOSTA-FRANCO and other unknown individuals who are involved in narcotics trafficking. Accordingly, I respectfully request that the Court issue a warrant to search SUBJECT DEVICE-1 and SUBJECT DEVICE-2.

## SUMMARY AND CONCLUSION

41.     Based upon the foregoing facts, I submit that there is probable cause to believe that the fruits and/or evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a)(1) and 846, will be found in the information stored in SUBJECT DEVICE-1 and SUBJECT DEVICE-2, identified in Attachment A-1 and A-2. SUBJECT DEVICE-1 and SUBJECT DEVICE-2 have remained in secure custody of the Philadelphia Police Department since the arrest of LACOSTA-FRANCO on September 22, 2025, before being transferred to DEA Philadelphia Field Division Group 42 on October 13, 2025.

42.     I declare under penalty of perjury that the foregoing is true and correct to the best of his knowledge and belief.

Respectfully submitted,

_/s/_____

Ryan Scanlan
Special Agent
Drug Enforcement Administration

Sworn and Subscribed before me by telephone
this _____ day of February, 2026:

_____

HONORABLE CAROL SANDRA MOORE WELLS
United States Magistrate Judge

**ATTACHMENT A-1**
Property to be Searched

One navy blue Apple iPhone with an unknown telephone number and unknown IMSI (**SUBJECT DEVICE-1**), recovered from GRISELLE LACOSTA-FRANCO on September 22, 2025.

**ATTACHMENT A-2**
Property to be Searched

One Apple iPhone in a black case with an unknown telephone number and unknown IMSI **(SUBJECT DEVICE-2)**, recovered from GRISELLA LACOSTA-FRANCO on September 22, 2025.

## ATTACHMENT B
Property to be Seized

1.  All records contained in SUBJECT DEVICE-1 and SUBJECT DEVICE-2 for the time period between August 22, 2025, and September 22, 2025 that relate to violations of Title 21 United States Code, Sections 841(a)(1), and 846, including:

   a. lists of customers and related identifying information;

   b. information concerning the types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs, including names; addresses, phone numbers, or any other identifying information;

   d. any information related to the methods of trafficking in drugs;

   e. any information recording domestic and international schedule or travel; and

   f. all bank records, checks, credit card bills, account information, and other financial records.

2.  Evidence of user attribution showing who used or owned SUBJECT DEVICE-1 and SUBJECT DEVICE-2 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including:

   a. Any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

1

b.  All data that has been manually programmed into a GPS navigation system, as well as data automatically stored by the GPS navigation system, including any and all electronic data which can be collected, analyzed, created, displayed, converted, stored, concealed, or transmitted, or similar computer impulses or data.

c.  Stored electronic information and communications, including telephone or address directory entries consisting of names, addresses and telephone numbers; logs of telephone numbers dialed, telephone numbers of missed calls, telephone numbers of incoming calls; schedule entries; stored memoranda; stored text messages; stored photographs; store audio; and stored video.